39 F.3d 1178
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Roosevelt BROADUS, a/k/a Supreme, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Andrew GAINES, a/k/a Smokey Hall, a/k/a Jamal Hall,
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James SIDBERRY, a/k/a Killer, Defendant-Appellant.
 Nos. 93-5289, 93-5299, 93-5318.
 United States Court of Appeals, Fourth Circuit.
 Argued June 9, 1994.
Decided Nov. 4, 1994.
 
 Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro. Norwood C. Tilley, Jr., District Judge. (CR-91-209-G).
 ARGUED: Walter T. Johnson, Jr., Greensboro, NC, for Appellant Sidberry; Susan Hayes, PFAFF, ELMORE & HAYES, Greensboro, NC, for Appellant Gaines; Donald Ray Vaughn, Greensboro, NC, for Appellant Broadus. David Bernard Smith, Assistant United States Attorney/Senior Litigation Counsel, Greensboro, NC, for Appellee. ON BRIEF: Walter C. Holton, Jr., United States Attorney, Greensboro, NC, for Appellee.
 M.D.N.C.
 AFFIRMED.
 Before WIDENER, WILLIAMS, and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Defendants Roosevelt Broadus, Robert Andrew Gaines, and James Sidberry appeal their convictions of conspiracy to possess with intent to distribute cocaine base, in violation of 21 U.S.C. Sec. 846 and Sec. 841(b)(1)(A). In addition, the defendants appeal their convictions of 18 U.S.C. Sec. 924(c)(1), carrying or using a weapon during or in relation to a drug trafficking crime. The defendants maintain that the evidence was insufficient to prove the single conspiracy charged in the indictment or the weapons charges, and that the district court erred in denying their motions for new trial and in determining drug amounts for sentencing purposes. Broadus also appeals his four-point enhance ment under U.S.S.G. Sec. 3B1.1(a). We affirm both the convictions and the sentences.
 
 
 2
 In recounting the details of this conspiracy, we view the facts in the light most favorable to the government, including all reasonable inferences. See Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Russell, 971 F.2d 1098, 1109 (4th Cir.1992), cert. denied, --- U.S. ----, 61 U.S.L.W. 3479 (1993). The proof at trial tended to show that the defendants, along with other co-conspirators Willie Pearson, Patrick Paret, Catherine Hicks, William Robertson, Dexter Hinton, Patrick McCall, Jr., and Robert Michael Donovan, engaged in a single conspiracy to possess with intent to distribute and to distribute cocaine base, beginning in November 1989, as charged in the indictment. Gaines, Broadus, Sidberry, Brooks, and Patrick Paret knew each other in New York. In November of 1989, after Broadus told Brooks about the money to be made selling crack cocaine in North Carolina, Broadus, Gaines, Brooks, Paret, and Gary Grannum, among others, went to Greensboro, N.C. with approximately two ounces of crack cocaine, and set up residence in local hotels. Once there, they divided up the drugs and each received packages of five hundred dollar value to sell and then gave the money to Broadus once they had sold them. Broadus and Grannum returned to New York City with the proceeds, bought more crack, and returned with it to Greensboro and continued drug dealing. Broadus supplied the money for frequent trips to New York to restock their crack supply, with different members of the conspiracy going at different times. Initially, Broadus and Paret controlled the packages and received the money, and Sidberry sold the drugs for Broadus.
 
 
 3
 Sometime in 1990, the group met Dexter Hinton, who lived in Greensboro. Broadus and his group received cocaine deliveries at the homes of different local Greensboro residents, including Hinton, and Broadus and Brooks would go there to pick them up, and then return to the hotel and divide them for resale. Brooks, Broadus, Gaines, Sidberry, and others were present when three to four ounces of crack were picked up and divided. Brooks met Pearson at Sidberry's house in New York while on one of the drug runs. Brooks and Sidberry had Pearson deliver about two ounces of crack cocaine to Greensboro. Pearson rented a house in Greensboro at 907 High Street, in the neighborhood where the conspirators were dealing. Pearson, Gaines, Sidberry, and McCall lived at the High Street residence, and occasionally Broadus, Miss Neal, or one of the drug couriers would stay there. Brooks, Paret, Pearson, and Patrick McCall were involved in drug activities out of the High Street house, as were the defendants Broadus, Gaines, and Sidberry. Both Broadus and Gaines supplied Brooks and the High Street location with drugs.
 
 
 4
 Grannum began supplying Hinton and Donovan, local Greensboro drug dealers in the housing projects, with drugs to sell. In June of 1990, Hinton met Broadus and began to chauffeur him for the purpose of making drug deliveries. Broadus supplied Donovan with cocaine to resell in the Greensboro projects. Subsequently, Broadus took him to High Street where he met Gaines, Sidberry, and Pearson. Broadus lived at 1414 Trinity Avenue in Greensboro, along with Miss Neal. Broadus wanted this residence and their phone number kept secret, with the exception of Gaines and Sidberry, among a few others.
 
 
 5
 Broadus was the head of this drug dealing organization, supplying drugs for distribution, and Gaines paid money to couriers who brought drugs down from New York and gave drugs to others to sell. Gaines recruited McCall in New York to bring drugs down to Greensboro, which he did on several occasions, receiving the cocaine in New York from Gaines or Sidberry. On one occasion, McCall and Sidberry brought crack to Greensboro together on the bus, and gave it to Brooks. On another occasion McCall brought the drugs to Greensboro accompanied by Sidberry and Gaines and delivered the drugs to High Street. Sidberry and McCall went to New York in January of 1991 to buy drugs for resale in Greensboro, but the money was taken at the airport. On one occasion, Patrick Paret gave McCall cocaine in New York, which he took by train to Burlington, N.C., where he was met by Miss Neal, Broadus, Robertson, and Hinton. Broadus had paid for the trip. Catherine Hicks was one of Broadus' drug couriers who made numerous trips.
 
 
 6
 Hinton rented motel rooms several times for Broadus for the purpose of receiving and distributing cocaine, which arrived in $40,000 to $60,000 packages. Broadus or Miss Neal would give these packages to Hinton, who distributed the crack cocaine in the housing project areas of Greensboro. After Broadus and Miss Neal moved into Trinity, Hinton went there almost every day to obtain crack cocaine for distribution. Hinton and Broadus would deliver drugs to or pick up money from Gaines and Sidberry at High Street. Hinton met William Robertson in January of 1990, when he arrived in Greensboro. Robertson stayed with Broadus and Miss Neal at Trinity for about a week and then moved into High Street, for the purpose of working for Broadus in running the drug distribution there and to help Hinton in distributing drugs. Miss Neal delivered drugs to High Street and collected drug sale money there from Pearson at High Street, which she gave to Brooks or Broadus.
 
 
 7
 In early 1991, McCall moved into High Street, and his function there was to make sure the house was clean, i.e. that drugs were stored outside the house. McCall moved out of the High Street house in April of 1991 into a house on Holt Avenue. The High Street location closed down, but crack distribution continued from McCall's house on Holt Avenue, where Gaines and Sidberry also lived. McCall continued to go to New York to bring back packages of cocaine, and he would deliver them in Greensboro to Gaines, or if he wasn't there, to Sidberry, and once picked up cocaine in New York for Broadus and gave it to Hinton at Holt Avenue. At Holt Avenue, Gaines gave crack to McCall and Sidberry, who distributed it. Hinton received crack from Gaines at Holt Avenue, and also at the projects. Just prior to Hinton's arrest in November of 1991, he received a $17,500 package of crack sent by Grannum from New York. He gave Grannum the money for the crack, who gave it to Broadus. Although Broadus, Gaines, and Sidberry each utilized some different street level drug distributors, Broadus was the central figure in supplying money and drugs. Sometimes Broadus received drug packages and sometimes Gaines received them, but they were often brought either by the same courier or by couriers working together, and they often received each other's packages.
 
 
 8
 Pearson brought cocaine to Greensboro from New York, delivering the drugs to Brooks, Gaines, and Sidberry, who converted it from powder to crack and cut it up. Brooks, Gaines, Pearson, and Sidberry would then distribute the drugs. On one occasion, a drug courier arrived at Pearson's motel room, met by Broadus, who took some of the drugs and left some for Brooks and Hinton. In November of 1990, Pearson and Sidberry went to New York to obtain crack cocaine, with money given to them by Broadus and Gaines. When the drugs were brought back, they were distributed by Brooks, Hinton, and Donovan. Broadus supplied Pearson with an alias, Michael Anderson, under which he could fly to New York to pick up drugs and rent the High Street residence. Pearson delivered money, obtained from street level drug sales, to Broadus at Trinity Street.
 
 
 9
 Broadus and Hinton purchased an AR-15 rifle, which was sometimes carried by Hinton in his car when he drove Broadus around and picked up drug money. The AR-15 was kept in Broadus' residence on Trinity, including times when drug deliveries were made there. On January 28, 1991, Hinton called Broadus because Hinton had heard that someone was trying to break into Hinton's girlfriend's apartment. Broadus arrived with three weapons, an AR-15 assault rifle, a Tech9, and a .357, but gave the AR-15 to Hinton to hold. Broadus left Hinton, and while he was gone, the police arrived and arrested Hinton with the AR-15 rifle, and the 12-gauge shotgun.[1]
 
 
 10
 Miss Neal bought a shotgun[2] because she and Broadus felt that it was needed to protect the Trinity residence, and the gun was kept loaded in the living room. On March 1, 1991, the Trinity residence was searched pursuant to a warrant. At that time, the Mossberg shotgun was in the living room. These were not the only guns obtained by members of the conspiracy. Brooks exchanged drugs for a .38 pistol, which McCall later took to New York and ended up in Sidberry's residence there. Brooks, Broadus, and Sidberry acquired a .45, a 9-millimeter carbine and a .44-millimeter carbine. They gave one of the guns to McCall to take to New York. The AR-15, a Tech 9-millimeter and a .357 were kept at Broadus' Trinity residence. On November 21, 1991, agents of the Drug Enforcement Administration, pursuant to arrest warrants issued in North Carolina, arrested Broadus, Gaines, and Paret in a residence in Elmont, New York. Two loaded handguns, a .357 magnum and a .38 revolver were seized in the basement of the residence, and a machine gun was seized from a bathroom hamper.
 
 
 11
 At trial, the judge instructed the jury that, in order to convict, they must find that a defendant was a member of the single conspiracy charged in the indictment, and not a member of some other separate conspiracy. The jury convicted each defendant of the single conspiracy charge in Count One of the indictment. In addition to the conspiracy conviction, the jury convicted Sidberry of three substantive drug offenses, Counts Five, Seven, and Eight, and the weapons offense contained in Count Four; Gaines of four substantive drug offenses, Counts Two, Five, Seven, and Eight, and Count Four; and Broadus of five substantive drug offenses, Counts Two, Three, Five, Seven, and Eight, and both weapons possession charges, Counts Four and Six. At the sentencing hearing on September 4, 1992, Pearson recanted some of his testimony at trial, and Hinton testified that he worked for Broadus and not for Gaines and that the two had separate drug dealing organizations. The defendants moved for a new trial, on the basis of Pearson's recanted testimony, as well as the testimony of Hinton at that hearing, but the district court denied the motion. After being charged with perjury, Pearson pleaded guilty to lying at the sentencing hearing, rather than at trial.
 
 I.
 
 12
 The defendants claim there was insufficient evidence to support the jury's finding that they engaged in the single conspiracy charged in the indictment. Rather, they claim the evidence showed the existence of multiple conspiracies, in that Broadus, Gaines, and Sidberry ran separate distribution networks. The district court instructed the jury that if they did not find the single conspiracy charged in the indictment they must acquit, and the determination of whether the evidence shows a single conspiracy or multiple conspiracies is one of fact within the province of the jury. See United States v. Banks, 10 F.3d 1044, 1051 (4th Cir.1993), cert. denied, --- U.S. ----, 62 U.S.L.W. 3755 (U.S. Feb. 22, 1994).[3] Keeping Banks in mind, and viewing the evidence we have previously related in this opinion in its totality, United States v. Mabry, 953 F.2d 127, 130 (4th Cir.1991) (citation omitted), cert. denied, --- U.S. ----, 60 U.S.L.W. 3780 (U.S.1992), it is evident that the jury's determination of a single conspiracy and each defendant's agreement and participation in that conspiracy is supported by substantial evidence, and, therefore, under Glasser, 315 U.S. at 80, we must affirm the convictions. The evidence showed that Broadus orchestrated this drug dealing organization, and that he, along with the help of Sidberry, Gaines, and others, would import cocaine to North Carolina from New York by giving money to drug couriers, including sometimes Sidberry and Gaines themselves, who would bring drugs back for distribution by Broadus, Gaines, Sidberry and others. The fact that each of the three defendants may not be tied to each and every transaction, or sometimes utilized street level dealers that the others did not, does not change this conclusion, especially where there was evidence introduced which tended to show that they shared the goal of the conspiracy, weapons, drug couriers, drug deliveries, some drug distributors, and use of the drug houses at High Street and Holt Avenue. As in Banks, no exact formal structure might be adduced from the evidence here, but the interdependence of Broadus, Gaines, and Sidberry in pursuing the goal of the conspiracy to distribute crack in the Greensboro area, is evident.
 
 II.
 
 13
 Count Four of the indictment charged that Sidberry, Broadus, and Gaines, among other co-conspirators, on or about January 28, 1991, possessed an Olympic Arms, SAW-15 semi-automatic rifle and an Arms Corporation 12-gauge shotgun in violation of 18 U.S.C. Sec. 924(c)(1). These were the two guns that police obtained pursuant to the arrest of Hinton on January 28, 1991. Count Six charged that the defendants, among others, on or about March 1, 1991, possessed a Mossberg, Model 500, 12-gauge shotgun, in violation of 18 U.S.C. Sec. 924(c)(1). This was the shotgun observed in the living room of the Trinity residence during the police search on March 1, 1991. The defendants claim that there was insufficient evidence to support the convictions of Broadus, Gaines, and Sidberry for possession of the AR-15 and the shotgun confiscated from Hinton on January 28, 1991, (Count Four) and Broadus' conviction of possession of the shotgun found during the March 1, 1991 search of his Trinity residence (Count Six).
 
 
 14
 In United States v. Cummings, 937 F.2d 941 (4th Cir.), cert. denied, --- U.S. ----, 60 U.S.L.W. 3343 (1991), we held that the Pinkerton doctrine, which makes conspirators liable for all reasonably foreseeable acts of their co-conspirators done in furtherance of the conspiracy, Pinkerton v. United States, 328 U.S. 640, 646-47 (1946), permits convictions of section 924(c)(1) to be based on a coconspirator's actions. As for Count Four, Broadus possessed the weapon at his residence at Trinity Avenue, where drugs for the conspiracy were kept. Co-conspirators Gaines and Sidberry were aware of Broadus' and Hinton's drug dealing activities in furtherance of the conspiracy and that the conspiracy used guns for its protection, having been present when some guns were bought and having bought guns themselves and received other guns from Broadus or other members of the conspiracy. Thus, it was reasonably foreseeable to Sidberry and Gaines that co-conspirators Broadus and Hinton would have guns for protection of the drug enterprise. To satisfy Pinkerton it is not necessary that the government prove, as the defendants contend, that the conspirators had knowledge that Broadus or Hinton possessed these particular guns.[4]
 
 
 15
 Broadus contests his conviction under Count Six, on the basis that there was insufficient evidence to prove that he was in constructive possession of the shotgun found in his house. This argument is without merit for two reasons. First, the district court charged the jury that the Pinkerton doctrine applied to Count Six; therefore Broadus' con viction of this charge can be predicated on the actions of coconspirator Miss Neal, in which case actual or constructive possession by Broadus is not required. See Cummings, 937 F.2d at 943-945. Second, the evidence showed that Broadus was in constructive possession of the shotgun, openly displayed in his home. See United States v. Morrison, 991 F.2d 112, 115 (4th Cir.), cert. denied, --- U.S. ----, 62 U.S.L.W. 3250 (U.S.1993), and cases cited therein. The evidence showed that Broadus wanted Miss Neal to purchase the shotgun for protection of both her and their Trinity Street residence, that he had knowledge of the gun's existence, and even had shot it by accident inside the house. The shotgun was openly kept in the living room during times that drug deliveries were made to the Trinity Street residence. Thus, substantial evidence supports a conclusion that Broadus had constructive, even if not actual, possession of this weapon. See United States v. Nelson, 6 F.3d 1049, 1053-54 (4th Cir.1993) (finding constructive possession of a gun where it was readily accessible in the defendant's residence and the defendant had actually possessed it on one occasion), cert. denied, --- U.S. ----, 62 U.S.L.W. 3792 (1994).
 
 III.
 
 16
 All three defendants moved for a new trial on the basis of Pearson's sentencing testimony, recanting some of his trial testimony, and Hinton's[5] sentencing testimony to the effect that the defendants operated separately. We review the district court's denial of a motion for a new trial for abuse of discretion, noting that the district court may consider the credibility of witnesses and in such cases should grant a new trial only "when the evidence weighs heavily against the verdict," United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir.1985).
 
 
 17
 Under United States v. Chavis, 880 F.2d 788, 793 (4th Cir.1989), a motion for a new trial should be granted only if (1) the evidence is in fact newly discovered, (2) the movant exercised due diligence in discovering the evidence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to the issues, and (5) the evidence would probably result in an acquittal at a new trial. Further, new evidence that is the result of recanted testimony must meet the test of United States v. Wallace, 528 F.2d 863 (4th Cir.1976): the court must be reasonably satisfied that the testimony given by a material witness at trial was false; that without it the jury might have reached a different conclusion; and that the defendant was taken by surprise by the false testimony, and was unable to meet it or did not know of its falsity until after the trial. 528 F.2d at 866.
 
 
 18
 Here, however, the district court determined that Pearson's trial testimony was not false, based on the district court's credibility determinations and Pearson's guilty plea to perjury at the sentencing hearing. So the evidence fails the test of Wallace on that account alone. And we are further of opinion that the district court did not abuse its discretion in denying a new trial based on Hinton's sentencing hearing testimony for just as sound a reason. Although the district court's order did not mention Hinton's sentencing testimony in denying the motion for a new trial, we note that this testimony could have been elicited by the defendants during cross-examination of Hinton. Hinton testified at sentencing to his non-involvement with Gaines, which, if true, would have been known to Gaines prior to the trial. Thus, this evidence, even if credible,[6] fails the second prong of Chavis in that the defendants did not exercise due diligence in discovering the evidence.
 
 IV.
 
 19
 All three defendants appeal the district court's calculation of the quantity of cocaine base to be considered as relevant conduct for the purpose of calculating their base offense level. Such a calculation is a factual determination, which we review only for clear error. See United States v. Hicks, 948 F.2d 877, 881 (4th Cir.1991). Without stating any specifics, the defendants contend that the district court held each of them responsible for almost all the drugs involved in the conspiracy.[7]
 
 
 20
 Broadus was sentenced based on 1,500 grams of cocaine base that he himself testified to at sentencing and did not object to setting his offense level at 38, based on that amount of drugs. Since Broadus did not object at sentencing to the amount of drugs that determined his base offense level, we will not consider this objection on appeal, absent plain error, of which there is none. See United States v. Davis, 954 F.2d 182, 187 (4th Cir.1992).
 
 
 21
 As for Gaines and Sidberry, our review of the record reveals that the district court excluded any drug amounts in which each defendant did not have some personal connection and, therefore, we find that the amounts attributable to each defendant are not clearly erroneous. The district court did not rely on the presentence report or the government's drug verification table, which correlated trial testimony to drug amounts for each defendant. Instead, the district court reduced both Gaines' and Sidberry's attributable drug amounts by removing drugs attributable solely to co-conspirators. Thus, amounts attributable solely to Broadus were not attributed to Gaines. The district court excluded from Sidberry's amount, drugs attributable to Miss Neal or Broadus. In fact, the only disagreement at sentencing as to Sidberry's amounts was whether to calculate the amount of drugs brought back by McCall to High Street using an average amount per package of two, three, or four and a half-ounces. Sidberry conceded that he was responsible for drugs that went to the High Street drug house. On the basis of the record, we are of opinion the district court was not clearly erroneous in its calculation of drugs attributable for sentencing purposes to each defendant.
 
 V.
 
 22
 As a final matter, Broadus asserts that the district court erred in giving him a four-level increase, pursuant to U.S.S.G. Sec. 3B1.1(a),[8] for being an organizer of a group which included Broadus, Hinton, Paret, Hicks, and Donovan, because Broadus contends that he did not play such a role in any group. The government contends that Broadus waived this issue by not bringing it before the district court at his sentencing hearing. Our review of Broadus' Statement of Position on Sentencing Factors, and the sentencing hearing transcripts of August 5, 1992, September 3 and 4, 1992, and February 25, 1992, does not indicate that an objection to the Sec. 3B1.1(a) four level increase was made at sentencing. "Absent plain error, appellate review of a sentence is waived when the defendant fails to object to the sentence calculation in the district court," United States v. Grubb, 11 F.3d 426, 440 (4th Cir.1993). We note, however, that even if an objection had been made, the district court's conclusion that Broadus organized a criminal activity consisting of five or more people was not clearly erroneous, since the evidence clearly established that Broadus organized a drug dealing enterprise, which included the individuals named by the district court, as well as many others.
 
 
 23
 Accordingly, the defendants' convictions and sentences are
 
 
 24
 AFFIRMED.*
 
 
 
 [1]
 Count Four of the indictment charged that Sidberry, Broadus, and Gaines, among other co-conspirators, on or about January 28, 1991, possessed an Olympic Arms, SAW-15 semi-automatic rifle and an Arms Corporation 12 Gauge shotgun in violation of 18 U.S.C. Sec. 924(c)(1). The AR-15 rifle and the shotgun seized from Hinton at the time of his arrest are the weapons referred to in this count
 
 
 [2]
 This shotgun is the one referred to in Count Six, which charged that the defendants, among others, on about March 1, 1991, possessed a Mossberg, Model 500, 12-gauge shotgun, in violation of 18 U.S.C. Sec. 924(c)(1)
 
 
 [3]
 In support of their conclusion that multiple conspiracies existed, the defendants point to testimony given at the sentencing hearing by Gaines,
 Grannum, Hinton, and Pearson (later determined to be perjured testimony) to the effect that the defendants operated separately. Not having been presented to the jury, this evidence adduced at the sentencing hearing is not considered in deciding defendants' insufficiency of the evidence claim.
 
 
 [4]
 Gaines' and Sidberry's claims that they had no knowledge of these guns rests on testimony given at the sentencing hearing, which does not affect the issue of whether the jury had substantial evidence on which to base the convictions. See supra at n. 3
 
 
 [5]
 The government concludes that the defendants did not argue Hinton's sentencing testimony as a basis for their motion for a new trial and, therefore, that this issue is waived as to appellate review. Hinton's testimony, however, was in the defendants' motions. (JA 71-72, 119-120)
 
 
 [6]
 We noted in United States v. Bynum, 3 F.3d 769, 773 (4th Cir.1993), that "[c]ourts are justifiably leery of post-trial statements by codefendants purporting to exonerate a cohort."
 
 
 [7]
 In order to also attribute to a defendant for sentencing purposes drug amounts attributed to a co-conspirator, those drugs must have been within the scope of the defendant's agreement and reasonably foreseeable to the defendant. See United States v. Gilliam, 987 F.2d 1009, 1012-13 (4th Cir.1993). See also U.S.S.G. Sec. 1B1.3(a)(1)
 
 
 [8]
 Sec. 3B1.1(a) prescribes a four-level increase in offense level "if the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."
 
 
 *
 The government's motion to file a supplemental appendix is granted without objection